IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| L.J., *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. JFM-84-4409 |
| RUTH MASSINGA, *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
SECOND INTERIM POST-JUDGMENT PETITION FOR
AWARD OF ATTORNEYS' FEES AND EXPENSES**

DOUGLAS F. GANSLER
Attorney General of Maryland

DAVID E. BELLER
Assistant Attorney General
Saratoga State Center, Suite 1015
311 West Saratoga Street
Baltimore, Maryland  21201
(410) 767-7726
Federal Bar #00500
Fax: (410) 333-0026
Email: dbeller@oag.state.md.us
      dbeller@dhr.state.md.us

MILLICENT EDWARDS GORDON
Assistant Attorney General
Bank of America Building, Tower One
100 South Charles Street, 15th Floor
Baltimore, Maryland  21201
(443) 378-4180
Federal Bar #03204

Fax: (443) 378-4205
Email: mgordon@oag.state.md.us
        mgordon2@dhr.state.md.us

CAROL ANN SMITH
Assistant Attorney General
Saratoga State Center, Suite 1015
311 West Saratoga Street
Baltimore, Maryland  21201
(410) 767-7726
Federal Bar #6465
Fax: (410) 333-0026
Email: casmith@oag.state.md.us
        casmith@dhr.state.md.us

ATTORNEYS FOR DEFENDANTS

# TABLE OF CONTENTS

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.   BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

III.  THE COURT SHOULD NOT AWARD THE TOTAL FEES
      REQUESTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

      A.    Any Fee Award Must Be Based on Reasonable Hourly Rates Charged
            by Local Attorneys with Comparable Experience in § 1983 and Related
            Civil Rights Cases.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

            1.    The Local Fee Guidelines Should Apply.. . . . . . . . . . . . . . . . . . . . .  7

            2.    Any Award of Attorneys' Fees Should be Limited to No
                  More Than the Hourly Rates in the Local Guidelines and
                  the Award Should be Further Reduced Because a
                  Substantial Portion of Plaintiffs' Attorneys' Activities
                  was Limited to Non-legal Work.. . . . . . . . . . . . . . . . . . . . . . . . . . .  12

            3.    Application of the Johnson Factors Requires this Court
                  to Limit Its Award to No More Than Local Guideline
                  Hourly Rates.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

                  a.    Monitoring the Consent Decree is Not of
                        Sufficient  Complexity or Difficulty to
                        Warrant an Award that Exceeds the Local
                        Guidelines.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

                  b.    Any Award of Attorneys' Fees Should Be
                        Limited to the Court's Guidelines Because
                        Efforts Expended by Plaintiffs' Attorneys
                        Were Not Commensurate with the Results
                        Obtained.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

            4.    Plaintiffs are not Entitled to an Award of Attorneys'
                  Fees for William Grimm.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

B.  Attorneys' Fees Cannot be Awarded for Excessive, Redundant, or Otherwise Unnecessary Hours... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    1.  The Amount of Time Plaintiffs' Attorneys Spent Reviewing and Preparing Responses to Defendants' 32nd Through 36th Six-Month Compliance Reports Was Excessive... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    2.  The Hours Billed by Mirviss Should be Reduced Further to Represent an Equitable and Reasonable Award... . . . . . . . . . . . 25

    3.  The Hours Billed by Mirviss and Lipkin for Contacts with Parties Identified as "Advocates" Should Be Reduced... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    4.  Lipkin's Hours Should be Reduced Due to Vague Billing Descriptions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    5.  Plaintiffs' Attorneys' Hours for Preparing their Fee Petitions and Negotiating Fees Are Excessive and Must be Reduced to Reach a Reasonable Fee... . . . . . . . . . . . . . . . . . . . 36

    6.  The Hours the Paralegals Spent Performing Clerical Work Should Be Reduced. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

C.  Any Award for Expenses Should Be Reduced. . . . . . . . . . . . . . . . . . . . . . 41

V.  SUMMARY OF REASONABLE ADJUSTMENTS. . . . . . . . . . . . . . . . . . . . . . 42

VI.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| L.J., *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. JFM-84-4409 |
| RUTH MASSINGA, *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' SECOND INTERIM POST-JUDGMENT PETITION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES

## I.    INTRODUCTION

Defendants, by their attorneys, Douglas F. Gansler, Attorney General of Maryland, David E. Beller, Millicent Edwards Gordon, and Carol Ann Smith, Assistant Attorneys General, submit this Opposition to Plaintiffs' Second Interim Post-Judgment Petition for Award of Attorneys' Fees and Expenses.

For the reasons explained below, the attorneys' fees requested by Plaintiffs should be denied to the extent that they exceed this Court's local guidelines, or represent activities that were not reasonable and necessary, and should otherwise be reduced to reflect the type of work performed and to make the award proportionate to the results obtained.  In this case,

where any award of fees implicates funds that might otherwise be available for the foster care children, careful scrutiny is appropriate.

## II.    BACKGROUND

In 1988, the parties agreed to enter into a consent decree (the "Consent Decree") that resolved the outstanding issues between them concerning systemic changes in the foster care system in Baltimore City. *L.J. v. Massinga,* 699 F.Supp. 508 (D. Md. 1988), *aff'd*, 838 F.2d 118 (4th Cir. 1988).   As provided in the Consent Decree at ¶ 39, the parties negotiated the payment of attorneys' fees for the litigation and settlement work performed by Plaintiffs' counsel.   In March 1989, the Maryland Board of Public Works approved $268,000 in attorneys' fees.  (Exhibit 1, Board of Public Works Action Agenda, March 29, 1989).

In 1991, the parties negotiated a modification of the Consent Decree.  *L.J. v. Massinga*, 778 F. Supp. 253 (D. Md. 1991).  As part of the negotiated agreement, the parties agreed that no attorneys' fees would be paid for work performed by Plaintiffs' counsel prior to the entry of the Modification.  *Id.* at ¶ 37.

Since then, Defendants have continued to work diligently on providing excellent child welfare services and fully implementing the Consent Decree.  (Exhibit 2, Decl. of Christopher J. McCabe I. at 15 ¶ 37; Exhibit 4, Decl. of Samuel L. Chambers.)[1]   The

---

[1]The McCabe Decl. I. dated April 8, 2005,  was appended to the Defendants' Response to the Plaintiffs' First Interim Post-Judgment Petition for Award of Attorneys' Fees and Expenses (Docket #378).  Defendants' first response and supporting documents are incorporated by reference.  The McCabe Decl. is appended to this response for ease of review.  An additional McCabe Decl. II., dated June 1, 2007, is attached to this memorandum as Exhibit 3.

Defendants have filed compliance reports twice a year detailing their efforts to implement the Consent Decree and providing the data required by the decree.

On February 22, 2005, Plaintiffs' filed their First Petition for Interim Award of Post-Judgment Attorneys' Fees and Expenses for activities conducted during the period June 1, 2002, through November 30, 2004. On April 8, 2005, Defendants filed their response to the fee petition. Subsequently, the parties reached agreement on a reasonable award, resulting in approval by the Board of Public Works of $367,534.74 in attorneys' fees and expenses. (Exhibit 5, Board of Public Works Action Agenda, June 15, 2005).

On May 8, 2007, Plaintiffs filed their second petition for an award of attorneys' fees and expenses for activities performed during the period December 1, 2004, through November 30, 2006. Defendants oppose awarding the full fee and expense requests of Plaintiffs on grounds that such an award would be inequitable and unreasonable under the circumstances of this case. *See Daly v. Hill,* 790 F.2d 1071, 1078 (4th Cir. 1986)(award of attorney's fees "should accomplish 'fair and reasonable compensation'")(quoting *Blum v. Stenson*, 465 U.S. 886, 901 (1984)).

## III.    THE COURT SHOULD NOT AWARD THE TOTAL FEES REQUESTED.

Section 1988 of Title 42 of the United States Code provides that, in any action or proceeding to enforce the civil rights provisions in the United States Code, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b); *Trimper v. City of Norfolk,Va.,* 58

F.3d 68, 73 (4th Cir. 1995).  A plaintiff who attains "prevailing party" status may be awarded

reasonable attorney's fees under § 1988.  *See Hensley v. Eckerhart,* 461 U.S. 424, 433

(1983).  The lodestar approach, the number of hours reasonably expended on the litigation

multiplied by a reasonable hourly rate, is the preferred method for calculating a reasonable

fee.  *See id.*

In considering the lodestar, the Court typically considers the following twelve factors:

(1)    the time and labor expended;
(2)    the novelty and difficulty of the questions raised;
(3)    the skill required to properly perform the legal services rendered;
(4)    the attorney's opportunity costs in pressing the instant litigation;
(5)    the customary fee for like work;
(6)    the attorney's expectations at the outset of the litigation;
(7)    the time limitations imposed by the client or circumstances;
(8)    the amount in controversy and the results obtained;
(9)    the experience, reputation and ability of the attorney;
(10)   the undesirability of the case within the legal community in which the suit arose;
(11)   the nature and length of the professional relationship between attorney and client; and
(12)   attorney's fees awards in similar cases.

*Johnson v. Georgia Hwy. Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir. 1974), *abrogated on

other grounds by Blanchard v. Bergeron,* 489 U.S. 87 (1989); *see also McDonnell v. Miller

Oil Co.,* 134 F.3d 638, 640 (4th Cir. 1998) (citations omitted).

In addition, the Court must scrutinize Plaintiffs' fee petition not from the perspective

of a plaintiff's law firm seeking to maximize income, but rather "from the point of view of

a cost-conscious client."  *Xiao-Yue Gu v. Hughes STX Corp.,* 127 F.Supp.2d 751, 765 (D.

Md. 2001) (quoting *Vaughns v. Board of Educ. of Prince George's County,* 598 F.Supp.

-4-

1262, 1277 (D. Md. 1984)).  Fee and cost awards "must be fair and must fully compensate prevailing attorneys," *Daly v. Hill,* 790 F.2d at 1081 n.15, but "they are not intended to 'produce windfalls to attorneys.'" *Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1359 (4th Cir. 1995) (quoting *City of Riverside v. Rivera*, 477 U.S. 561, 580 (1986)).

Case law supports Plaintiffs' contention that post-judgment monitoring of a consent decree is a compensable activity under § 1988.  *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546 (1986).  Nevertheless, before obtaining a fee award, Plaintiffs must establish that their post-judgment monitoring activities were *reasonable and necessary* to insure compliance with the decree.  *Keith v. Volpe*, 833 F.2d 850, 855-56 (9th Cir. 1987) (citing *Garrity v. Sununu,* 752 F.2d 727, 738-39 (1st Cir. 1984) (emphasis added).  Plaintiffs assert that over the course of a two year period, four senior litigators spent in excess of 3800 hours monitoring the consent decree, and other staff spent in excess of 792 hours performing monitoring activities.  (Lipkin Decl. at 9, ¶ 16.)  Plaintiffs claim that while they could have requested attorneys fees and expenses in excess of $1.6 million dollars, they reduced their attorneys' billable hours significantly and reduced their attorneys' fees to $1,083,425.60.  (Lipkin Decl. at 9-10, ¶16.)

Plaintiffs' fee petition inflates both the number of hours that were necessary to effectively monitor Defendants' compliance with the Consent Decree and the hourly rates that should be used, thereby reaching an excessive total that is not reasonable or equitable.  In addition, the hours Plaintiffs' attorneys reportedly expended preparing their fee petitions

is excessive.  In the absence of unusual circumstances, the hours allotted for preparing and litigating the attorneys' fee case should not exceed 3% of the hours in the main case when the issue is submitted on the papers. . . ."  *Coulter v. State of Tennessee,* 805 F.2d 146, 151 (6th Cir. 1986); *see also Bell v. United Princeton Properties, Inc.* 884 F.2d 713, 722 (3rd Cir. 1989).

Accordingly, this Court should reduce the hourly rates requested to reflect the prevailing market rates in the Baltimore community, as well as the hours attributed to Plaintiffs' counsel.  This Court's award to Plaintiffs should not exceed $564,347.20 in attorneys' fees and not more than $46,321.61 in expenses.

A.    **Any Fee Award Must Be Based on Reasonable Hourly Rates Charged by Local Attorneys with Comparable Experience in § 1983 and Related Civil Rights Cases.**

"[D]etermination of the hourly rate will generally be the critical inquiry in setting the 'reasonable fee,' and the burden rests with the fee applicant to establish the reasonableness of a requested rate."  *Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990) (citing *Blum v. Stenson,* 465 U.S. 886, 895-96 n.11 (1984)).  "Specifically, the applicant must produce specific evidence of the 'prevailing market rates in the relevant community' *for the type of work* for which he seeks an award."  *Spell v. McDaniel,* 824 F.2d 1380, 1402 (4th Cir. 1987), *cert. denied* 484 U.S. 1027 (1988) (quoting *Blum,* 465 U.S. at 895-96 n.11)  (emphasis added).  "[T]he community in which the court sits is the first place to look to in evaluating the prevailing market rate."  *Rum Creek Coal Sales, Inc. v. Caperton,* 31 F.3d 169, 179 (4th

Cir. 1994); *see also Nat'l Wildlife Fed'n v. Hanson,* 859 F.2d 313, 317 (4th Cir. 1988). Plaintiffs' attorneys' hourly rates far exceed those recognized by this Court, particularly given that Plaintiffs' attorneys' activities are limited to monitoring the consent decree.

### 1.    The Local Fee Guidelines Should Apply.

Plaintiffs' references to hourly rates outside the Baltimore community are not relevant to the inquiry in this case.  (Mirviss Decl. at 3, ¶ 10, and at 5, ¶ 12 ; Pearl Decl.; Wolf Decl. at 10, ¶ 21; Grimm Decl. at 6, ¶¶ 11-12.)  The Fourth Circuit has made clear that market rates in Baltimore for comparable civil rights cases should be the governing standard, not what the involved lawyers might typically charge paying clients in some other community. *Buffington v. Baltimore County*, 913 F.2d 113, 129-30 (4th Cir. 1990), *cert. denied*, 499 U.S. 906 (1991).  Courts should look to prevailing market rates outside the local community only in exceptional circumstances. *Xiao-Yue Gu*, 127 F.Supp.2d 751, 767 (D. Md. 2001).

Plaintiffs have failed to establish that their attorneys' hourly rates should exceed those outlined in this Court's local guidelines.  *See* Rules of the United States District Court of Maryland: Appendix B: Rules and Guidelines Determining Lodestar Attorneys' Fees in Civil Rights and Discrimination Cases ("Local Guidelines").  The declarations Plaintiffs have submitted in support of their fee petition fail to state the "precise fees that counsel with similar qualifications have received in comparable cases." *J.P. v. County Sch. Bd. of Hanover County, Va.,* 2007 WL 840090 at *3 (E.D. Va. 2007)(quoting *Spell v. McDaniel,* 824 F.2d 1380, 1402 (4th Cir. 1987)).  Moreover, of the several affidavits Plaintiffs have

submitted in addition to those of their own counsel, only one is from an attorney who practices in this locality.

Andrew Freeman, a partner at the local law firm of Brown, Goldstein, and Levy, declares that the rates which Plaintiffs seek for their attorneys Lipkin, Posner, and Mirviss are "below market rates for the Maryland/Baltimore area for attorneys of comparable experience."  (Freeman Decl. at 3, ¶ 8).  Freeman, however, fails to demonstrate those rates are comparable to rates awarded in cases where monitoring a consent decree has been the primary activity of counsel.  His summary statements provide little guidance in determining the appropriate fees to award counsel in this particular case.  He merely asserts in a conclusory manner that Lipkin, Posner, and Mirviss should receive the hourly rates Plaintiffs request because monitoring the consent decree is complex and difficult and can only be handled by senior attorneys  (Freeman Decl. at 4, ¶ 9) and contends that the complexity and difficulty of the case is evidenced by the Defendants assigning to "this matter their two most senior attorneys." (*Id.*)

William Grimm, a senior attorney at the National Center for Youth Law, Inc., located in Oakland California, declares that the hourly rates requested for Lipkin, Posner, and Mirviss "are well within the norm for rates awarded in other child welfare class actions." (Grimm Decl. at 6, ¶ 15.)  However, he too fails to cite to any specific awards or cases to support his declaration.  Declarant Benjamin S. Wolf, practicing in Illinois, makes a similarly unsupported statement:  "Plaintiffs' requested fees conform with rates and amounts . . . in

similar cases across the country." (Wolf Decl. at 10, ¶ 21.) He declares that Plaintiffs rates conform with rates in his Illinois case and recites that senior attorneys in his office have received fees based on hourly rates of more than $300. (*Id.*)

In *Plyler v. Evatt*, 902 F.2d 273 (4th Cir. 1990), the 4th Circuit stated that "[i]n addition to the attorney's own affidavits, the fee applicant must produce satisfactory 'specific evidence of the 'prevailing market rates in the relevant community' 'for the type of work for which he seeks an award.'" *Id.* at 277. Not one of Plaintiffs' declarants has produced that information. As the District Court in *J.P.* made clear, the affidavits must be "based on fees they themselves have charged, [and] fees they have submitted to courts in similar cases in the district [where the case arose.]" *J.P.,* 2007 WL 840090 at *3.

This Court's guidelines for determining attorneys' fees in civil rights cases and case law support a significant reduction in the hourly rates requested by Plaintiffs. Plaintiffs are requesting a $400 hourly rate for their attorneys Mirviss and Lipkin, and $370 hourly for Gary Posner. All of these hourly rates are well outside the range that this Court has provided in its Local Guidelines, which set the prevailing market rate for attorneys of Mirviss, Lipkin, and Posner's experience at $200-275 per hour.[2] *Id.* at § 3.

---

[2] Plaintiffs note that this Court has proposed increasing the prevailing market rates set forth in the Local Guidelines. The proposed changes include an increase in the hourly rate for lawyers with 15 or more years of experience from $200-$275 hourly to $275-$400 hourly. Plaintiffs seek an hourly rate award at the higher end of the proposed guidelines.

On May 31, 2007, defendants confirmed with Frances E. Kessler, Chief Deputy, United States District Court for the District of Maryland, that the proposed changes will not take effect on June
(continued...)

In *Xiao-Yue Gu,* this Court declared that "the rates established in [its] Guidelines provides the better barometer for gauging the prevailing market rate for attorneys in this community." *Xiao-Yue Gu,* 127 F.Supp.2d at 768.  This Court has specifically enforced both the hourly rates and requirements set forth in the Local Guidelines.  *Id.* at 766-67 (applying Local Guideline rates for New York lawyers); *cf Knussman v. Md. State Police*, 2005 WL 701065 at *3 (D. Md. March 11, 2005)(the district court awarded a Local Guideline rate of $250 per hour after the Fourth Circuit found that the district court's initial award of $ 275 hourly was excessive in light of plaintiffs' limited success).

In *Bd. of Educ. of Frederick County v. Summers,* 358 F.Supp.2d 462 (D. Md. 2005), this Court awarded Local Guideline rates to attorneys who successfully represented a multiply-disabled child in an IDEA case that involved a due process hearing and an appeal by the Board of Education of Frederick County.  *Id.* at 473.  There, plaintiffs' counsel spent 284.4 hours representing the child in the due process hearing.  *Id.* at 467.  She requested her standard hourly rate of $200 and was awarded that rate.  *Id.* at 471.  In the appeal process, the child was represented by six attorneys and two paralegals from the Washington, D.C. law firm of Beveridge & Diamond.  While counsel performed more than 1700 hours of service on the appeal, the firm sought fees for only 818.5 hours, some of which exceeded the ranges

---

[2](...continued)
1, 2007, as stated by Plaintiffs.  The effective date has been postponed.

Even if this Court awards fees based on the proposed changes, plaintiffs' counsel should receive an hourly rate no greater than $275, in order to reflect the type of work they performed during the period in question.

provided in the Local Guidelines.  *Id.* at 467.  This Court awarded the firm's attorneys the

Local Guideline rates even though both their standard and requested rates were higher.  *Id.*

at 471.  Strictly applying the Local Guideline rates, this Court rejected Beveridge &

Diamonds' request for higher rates, stating:

> The Court, however, does not believe that Beveridge & Diamond's fees should
> exceed the upper range of lodestar rates included in the Local Rules.  The
> IDEA provision addressing rates states that they must be based on the rates
> prevailing in the community in which the action or proceeding arose.
> Although the action first arose in Frederick County, the proceeding appealing
> the administrative due process hearing arose in this Court, sitting in Baltimore,
> Maryland.  The prevailing rates in the Baltimore community are generally
> lower than those in Washington, D.C.  Although, as the Summers note, a court
> may award hourly rates above those recommended by the Local Rules, this
> Court is not persuaded to do so in this case.

*Id.*  (citation omitted).

In *Broccoli v. Echostar Communications Corp.,* 229 F.R.D. 506 (D. Md. 2005), this

Court awarded plaintiff's attorneys' hourly rates within the Local Guidelines for purely legal

work. *Id.* at 513-14 (drafting and editing a motion for sanctions regarding  defendants'

spoliation of evidence and litigating plaintiff's "wage payment claim").  *See also Rutherford*

*v. CRU Building Corporation,* 2006 WL 559215 *2 (D. Md. 2006)(court accepted hourly

rates requested by plaintiff because the rates were within the Local Guidelines); *Essex v.*

*Randall,* 2006 WL 83424 *5 (D. Md. 2006)(plaintiffs' provided no justification for hourly

rates above the Local Guidelines).

In *Stone v. Thompson*, 164 F.Supp.2d 639 (D. Md. 2001), a civil rights case, the *only* reason this Court awarded a Washington, D.C. practitioner a blended *Laffey*[3] rate was "that the . . . judicial action by plaintiff [was] only the latest of several adversarial proceedings between the parties, the causes of which ha[d] persisted for many years." *Id.* at 640 (emphasis added). In this case, there have been no substantial adversarial proceedings since the Consent Decree was entered.[4] Plaintiffs' counsel have been limited to monitoring compliance with the consent decree.

> **2.    Any Award of Attorneys' Fees Should be Limited to No More Than the Hourly Rates in the Local Guidelines and the Award Should be Further Reduced Because a Substantial Portion of Plaintiffs' Attorneys' Activities was Limited to Non-Legal Work.**

Unlike counsel in *Summers* and *Broccoli*, who were involved in extensive legal proceedings, Plaintiffs' attorneys' post-judgment work in this case has comprised regular and ordinary monitoring activities. Furthermore, during the period covered by the second fee petition, their work has included out-of-court activities such as "gathering information,

---

[3] "The Laffey Matrix was established, and is updated, by the Department of Justice, to reflect the prevailing market rate for attorneys by years of practice pursuant to *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C. Cir. 1984), *overruled in part on other grounds by Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988) (en banc)." *Oil Chemical & Atomic Workers Intern. Union AFL-CIO v. U.S. Dep't of Energy*, 141 F. Supp. 2d 1,9 n. 13 (D D.C. 201). *Laffey* rates are not applicable here because they are higher than the guidelines adopted by the U.S. District Court for the Fourth Circuit.

[4] In December 2005, plaintiffs filed a petition for a temporary restraining order and preliminary injunction to gain access to the Baltimore City Department of Social Services' Gay Street office. (Mirviss Decl. at 15, ¶ 32a.) There were no depositions and no hearing. However, other related pleadings and a settlement document were filed.

investigating complaints, and 'developing a coherent picture.'" *Walker v. U.S. Dept. of Housing and Urban Dev.*, 99 F.3d 761, 771 (1996). As the Court stated in *Walker*, "[t]hese are clerical duties that could have been handled by non-lawyers." *Id.* The rate for such work should be discounted across the board to reflect its non-legal nature.

Indeed, the Fourth Circuit has recognized that an award of attorney's fees may require adjusting hourly rates to reflect the type of work performed. In *Daly v. Hill*, the Fourth Circuit reviewed a district court's award of attorneys' fees in a § 1983 police brutality case. *Id.* 790 F.2d at 1074. In reviewing the hourly rate awarded by the district court, the Fourth Circuit concluded that the district court had not erred in "refusing to consider the higher in-court fees because the compensable hours in this case are almost exclusively for out-of-court time." *Id.* at 1080 n.13.

Similarly, the Fifth Circuit has recognized that adjustments to the hourly rate may be necessary when awarding fees for non-legal work. *See Walker,* 99 F.3d at 770 (non-legal work, such as regular monitoring activities "may command a lesser rate")(quoting *Johnson v. Georgia Hwy. Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974). In *Johnson,* the 5th Circuit said:

> It is appropriate to distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics and other work which can often be accomplished by non-lawyers but which a lawyer may do because he has no other help available. Such non-legal work may command a lesser rate. Its dollar value is not enhanced just because a lawyer does it.

*Johnson*, 488 F.2d at 717. *See also Cruz v. Hauck,* 762 F.2d 1230, 1235 (5th Cir. 1985).

This Court should evaluate Plaintiffs' fee petition in light of what a fee paying client would consider as reasonable for monitoring the consent decree and adjust it accordingly. "Hours that are not properly billed to one's *client* also are not properly billed to one's adversary. . . ." *Hensley,* 461 U.S. at 434 (emphasis in original).

> **3.    Application of the Johnson Factors Requires this Court to Limit Its Award to No More Than Local Guideline Hourly Rates.**
>
> **a.    Monitoring the Consent Decree is Not of Sufficient Complexity or Difficulty to Warrant an Award that Exceeds the Local Guidelines**.

Contrary to Plaintiffs' contentions, the monitoring phase of this case has not presented any novel or complex issues that have surfaced in similar consent decree cases. Therefore, Plaintiffs' attorneys' hourly rates should remain within the Local Guidelines.

In other consent decree cases, plaintiffs' counsel have faced tremendous difficulties due to the extremely large size of the plaintiff class, in addition to the fact that the consent decrees required an overhaul of welfare systems *statewide*.

For instance, in *R.C. v. Nachman*, 992 F.Supp. 1328 (M.D. Ala. 1997), the plaintiff class included all children who might potentially come in contact with the state's child welfare system, and the consent decree called for an overhaul of the child welfare system statewide. In addition, the consent decree did not set out a precise means for accomplishing objectives, but set forth "'goals' and a 'system of care' consisting of 'operating principles' or 'standards' designed to achieve the goals.'" *Id.* at 1329-30. The court stated:

-14-

"[w]hile not novel, the court finds that the issues in this case are complex. The size of the class and the nature and scope of the relief, are among the factors that contribute to the complexity and difficulty of this case. Additionally, the court recognizes that monitoring and implementation of the Consent decree has required Plaintiffs' counsel to develop and maintain expertise in a number of highly specialized areas, as well as expend considerable time on this case." *Id.* at 1334.

In *Wyatt,* 67 F.Supp.2d 1331, the plaintiff class was equally large. It included Alabama's current and future mentally-retarded and mentally-ill residents in the mental health and mental retardation system. Again, the consent decree required reform in the system's facilities *statewide*. *Id.* at 1334. The *Wyatt* court viewed the litigation "from beginning to end . . . [as] a difficult and demanding task[,] . . . [requiring a] lawyer skilled in the complex and rapidly changing law of mental health. . . ." *Id.* at 1352.

In contrast, the Consent Decree does not present such challenges. The plaintiff class is limited to children within the Baltimore City foster care system. Moreover, the reforms required in the Consent Decree do not have to be implemented statewide and the standards required are, for the most part, specifically spelled out and easily measured. *See* Consent Decree at ¶ 33. The universe is set out in numbered paragraphs that are largely quantitative. The reports contain aggregate data, setting forth the steps taken to implement the systemic reform contemplated by the Consent Decree, and setting forth Defendants' steps to achieve compliance. Plaintiffs have asked for and received copies of the supporting data. (Exhibit 6, Decl. of Barbara Peart at 2, ¶ 5.)

Plaintiffs contend that their counsel's job has been made more difficult and complex by the Defendants' failure to provide them with confidential information about children in foster care and to be forthright about their non-compliance with the Consent Decree. Defendants, however, have never denied Plaintiffs reasonable access to information. Defendants actually provide more information than required by the Consent Decree. Individual class members have individual attorneys who represent them and their needs in the juvenile court. The Consent Decree specifically acknowledges that role. Consent Decree at ¶ 36. Only in unusual circumstances, when a specific matter cannot be resolved, are the class counsel entitled under the consent decree to get access to confidential case records, and then only with a protective order.[5]  *Id*.

Further, Plaintiffs argue that Defendants' 'secretive' and 'obstinate' behavior has made it difficult to monitor the Consent Decree.  (Lipkin Decl. at 16-17, ¶¶ 25, 26.) Plaintiffs' characterization of Defendants is inappropriate and unwarranted.   In fact, Defendants have acted in good faith to work with the Plaintiffs in monitoring compliance with the Consent Decree.  (*See* Exhibit 2, McCabe Decl. I.)  For instance, Secretary McCabe initiated regular meetings with Plaintiffs' attorneys because he believed "it would be useful and a show of good faith." (Exhibit 2, McCabe Decl. I. at 4, ¶ 9. ) Additionally, Defendants arranged for Plaintiffs' attorneys to regularly visit the Gay Street offices and routinely provided them with information about the number of children staying there and the length

---

[5] Recently, this Court signed a protective order (Docket #454) allowing Plaintiffs' attorneys access to broad categories of documents that were not covered by the Consent Decree.

of their stays.   (Mirviss Decl. at 15, ¶ 32a.) Many of the children's case files were voluminous given that Plaintiffs had requested information dating back to the time the children entered care.   (*Id.* at 16, ¶ 32b.)

Significantly, on the eve of the agreement to negotiate a new settlement, Plaintiffs delivered a 227-paragraph Public Information (PIA) Request to Defendants. (*See* Exhibit 7, Plaintiffs' PIA Request dated April 7, 2006.)   There was no restraint in the request for information.  The request was unduly burdensome and required numerous State employees to adjust their work schedules to aid in responding to the request.   Nevertheless, Defendants worked diligently to respond to the request in a timely manner.   The task of copying was substantial.  A private firm had to be employed to copy the more than 50,000 pages at a cost of $8,568.25 to the State.  (Exhibit 8, Invoice for Copying.)[6]

Clearly, Defendants did not impede Plaintiffs' monitoring activities.  In fact, during this monitoring period, Plaintiffs have created a web-based database using the information that Defendants provided them.  (*Id.* at 6, ¶ 14.)  Defendants' good faith efforts to work with Plaintiffs should not be discredited by awarding Plaintiffs' attorneys' hourly rates exceeding the prevailing market rates established by the Local Guidelines.  Rather, Plaintiffs' attorneys should be awarded hourly rates to reflect the nature of the work they performed.  Their post-

---

[6] The parties agreed that a response to the PIA request could be deferred until the conclusion of the mediated discussions. After the failure of the discussions, and subsequent to the entry of an agreed upon protective order (Docket #454), Defendants produced the documents.

judgment activities did not involve complex or novel legal and/or enforcement activities, only ordinary out-of-court work.

> **b.    Any Award of Attorneys' Fees Should be Limited to the Court's Guidelines Because Efforts Expended by Plaintiffs' Attorneys Were Not Commensurate with the Results Obtained.**

This Court should keep Plaintiffs' attorneys' hourly rates within its own Local Guidelines, because when viewed realistically, the $1,083,425.60 attorneys' fee requested by Plaintiffs is far out of proportion to any results they claim to have obtained through their efforts during the monitoring period.  "Fee awards 'in a post-decree monitoring setting . . . are [not] immune from the possibility of reduction under the principles of *Hensley.*'"  *Ass'n for Retarded Citizens of North Dakota v. Schafer*, 83 F.3d 1008, 1011 (8th Cir.), *cert. denied*, 519 U.S. 993 (1996) (quoting *Joseph A. v. New Mex. Dept. of Human Servs.*, 28 F.3d 1056, 1060 (10th Cir. 1994)).   The Supreme Court's decisions interpreting § 1988 insist that to be reasonable, a fee award must be proportionate to results.  *See  Hensley v. Eckerhart,* 461 U.S. at 424, 436.  *Farrar v. Hobby,* 506 U.S. 103, 114 (1992); *Marek v. Chesny,* 473 U.S. 1, 11 (1985).

In their fee petition, Plaintiffs take credit for some of the same successes that they claimed to have achieved during the period covering their first fee petition.  *See* Plaintiffs' First Fee Petition at 38-39.   These achievements are not theirs to claim.  The achievements grew out of Secretary McCabe's commitment to improving the lives of Baltimore's children. Plaintiffs' counsel had little to do with persuading then Secretary McCabe to implement

measures to improve conditions for caseworkers and children in Baltimore City's child welfare system. (Exhibit 2, McCabe Decl. I. at 3, ¶¶ 6, 7.)

Having been fully apprised of the Consent Decree, Secretary McCabe committed to hiring a sufficient number of caseworkers in the City to comply with the caseload requirements of the Consent Decree. (*Id.* at 5, ¶ 10.) Although the State was in a significant cost containment environment, Secretary McCabe was able to place graduating social workers in child welfare positions in Baltimore City in June 2003. Later in 2003 and in 2004, Secretary McCabe secured permission to hire additional workers for Baltimore City. (*Id.* at 5, ¶ 10.) Secretary McCabe also lobbied the General Assembly for $1 million to recruit new foster homes. But, he did not take that action at the urging of plaintiffs' counsel. (*Id.* at 12, ¶ 31.)

In addition, Plaintiffs' counsel have overstated their role in the Defendants' obtaining a statewide $1 million budget increase for flex fund spending for family preservation programs and in obtaining a $1.3 million budget for fiscal year 2008 for upgrading Baltimore City's health suite. Defendants recognized that additional funds and resources were warranted with respect to both the health suite and family preservation programs prior to the Defendants receiving any input from the Plaintiffs. (Exhibit 3, McCabe Decl. II. at ¶ 8.)

Significantly, the mediated discussions did not result in the changes to the Consent Decree that Plaintiffs hoped to achieve. (Lipkin Decl. at 22, ¶ 27.) Given this significant

failure, Plaintiffs hourly rates should remain within the current Local Guidelines. (Grimm Decl. at 4, ¶ 8.)

Finally, since assuming his duties as Director of the Baltimore City Department of Social Services in 2004, Sam Chambers has spearheaded numerous initiatives designed to produce positive outcomes for children and families served by BCDSS. These are described in detail in his attached Declaration (Exhibit 4.) As Mr. Chambers explains, Plaintiffs' counsel played no role in most of these initiatives, although Mr. Chambers has always been open to their input.

### 4. Plaintiffs are not Entitled to an Award of Attorneys' Fees for William Grimm.

Plaintiffs are not entitled to an award of attorneys fees or expenses for William Grimm. Grimm is not Plaintiffs' attorney. He has not entered his appearance in this case nor has any other attorney from his law firm entered their appearance. In fact, Grimm is not admitted to practice before this Court. *See* Local Rule 101.1 ("only members of the Bar of this Court may appear as counsel in civil cases").

Moreover, Lipkin, was quite capable of handling the negotiations alone. (Exhibit 3, Christopher McCabe Decl. II. at ¶ 6.) This is especially so as Defendants did not have counsel at the table.[7] (*Id.*) *See Cerqueira v. American Airlines, Inc.*, 2007 WL 1086988 at

---

[7]As explained in Secretary McCabe's Declaration, Plaintiffs' assertion that Plaintiffs' had to hire Grimm because of Defendants' insistence that Mirviss not be present is misleading because it omits any context regarding the format for the mediated discussions. Secretary McCabe recommended that Plaintiffs' attorneys Mirviss and Posner and Defendants' attorneys Shultz and Gordon be excluded (continued...)

*6 (D. Mass. 2007) ("[T]he time for two or three lawyers in a courtroom or conference, when one would do, 'may obviously be discounted.'"). Indeed, Lipkin was knowledgeable about the consent decree when she sat down at the discussion table. She already had served 10 months as Plaintiffs' lead counsel, having entered her appearance in August 2005. (Lipkin Decl. at 2, ¶ 3; Mirviss Decl. at 9, ¶ 20.) Prior to that, Lipkin spent eight years managing the Legal Aid Bureau's contract with the Department of Human Resources to represent children in dependency proceedings throughout Maryland. (Lipkin Decl. at 2, ¶ 4.) In addition, Lipkin has more than twenty years of experience in child welfare law and practice, including direct representation of children in the State's CINA and guardianship proceedings and drafting its laws and rules for child welfare. (*Id.*)

Contrary to Plaintiffs' assertions, they were not prejudiced by not having Mirviss and Posner at the mediated discussions. Lipkin typically consulted with Mirviss and Posner before and after each meeting with the Defendants. Eventually, Mirviss and Posner joined her at the mediated discussions. (Mirviss Decl. at 18, ¶ 32e.)

### B. Attorneys' Fees Cannot be Awarded for Excessive, Redundant, or Otherwise Unnecessary Hours.

The purpose behind fee-shifting statutes like § 1988 is "to 'ensure effective access to the judicial process for persons with civil rights grievances,' *Hensely v. Eckerhart*, 461 U.S.

---

[7](...continued)
from the direct negotiations. (Exhibit 3, McCabe Decl. II. ¶ 6.) He believed that negotiations were more likely to succeed if they were not present given the contentious nature of their interactions over the years in zealously representing their respective clients. (*Id.*)

at 429, (internal citation omitted), and are 'not to serve as full employment or continuing education programs for lawyers and paralegals.'" *Cerqueira*, 2007 WL 1086988 at *6 (citations omitted). "Courts have a duty to eliminate hours that are excessive, redundant, or otherwise unnecessary." *Mendoza v. Brewster Sch. Dist. No. 111,* 469 F.Supp.2d 905, 914-15 (E.D. Wa. 2006) (citing *Hensley*, 461 U.S. at 434).

Mirviss and Lipkin's excessive billings warrant a substantial across-the-board decrease in their fees. Generally, both devote an inordinate number of hours to tasks that were disproportionate to the substance of the results sought, and many of the hours billed do not qualify as legal work.

> **1.    The Amount Of Time Plaintiffs' Attorneys Spent Reviewing And Preparing Responses To Defendants' 32nd through 36th Six-Month Compliance Reports Was Excessive.**

Mirviss spent an inordinate amount of time preparing Plaintiffs' responses to the Defendants' six-month compliance reports. Mirviss is billing 110.5 hours for analyzing, reviewing, writing, and editing the responses.   (Exhibit 9, Chart of Mirviss' Time on Responses.) Within four months of serving as Plaintiffs' lead attorney, Lipkin joined Mirviss in the seemingly endless task of analyzing, reviewing, and preparing this response.  Lipkin spent 83.3 hours on this activity chart.   (Exhibit 10, Chart of Lipkin's Time on Responses.) The sum total of the hours they spent analyzing, reviewing, editing, preparing, and writing their responses is excessive.  (See  Exhibit 6, Peart Decl. at 3, ¶ 6.)

Defendants never contemplated that Plaintiffs' attorneys would file lengthy responses that are of little value to Defendants in fulfilling the vision set out in the Consent Decree.[8] (*See* Peart Decl. at 3, ¶7.)  It is challenging to read through their lengthy responses, because Plaintiffs' responses are not "narrowly tailored to the litigation goal of ensuring Defendant's compliance with the Consent decree."  *Earth Island Institute, Inc. v. Southern California Edison, Co.*, 92 F.Supp.2d 1060, 1064 (S.D. Ca. 2000).  (*See* Exhibit 2, McCabe Decl. I. at 11, ¶ 29.)

Over the years, Plaintiffs' attorneys have reported spending hundreds of hours preparing and writing responses to the six-month compliance reports, that are largely redundant from response to response and are not a productive monitoring activity.  (Exhibit 6, Peart Decl. at 3, ¶6.)  Plaintiffs simply substitute any new Quality Assurance data, rearrange or reword sentences and paragraphs, and duplicate their observations to conform to the most recent compliance report.  The Plaintiffs' conclusions remain the same -- that Defendants are not in compliance with aspects of the Consent Decree.  The Plaintiffs' responses are, therefore, redundant in the way they address the various service areas covered. (*Id.*)

Examples of redundancies in their recent responses include the following:

---

[8] Lipkin reports that Plaintiffs' attorneys wrote three "large" responses, each being in excess of 100 pages and having more than 50 attachments.  (Lipkin Decl. at 15-16, ¶ 23.)

1.      Plaintiffs' responses regarding "Caseworker Credentials & training" remain essentially the same in Plaintiffs 31st response at 20-21; 32nd response at 37-38; and the second corrected version of the 33rd/34[th] response at 48-49.

2.      Plaintiffs' responses regarding "Placements and Supportive Services" are essentially the same in the 32nd response at 38-40 and the second corrected version of the 33rd/34[th] response at 49-50.

3.      Plaintiffs' responses regarding "Sibling Visits" are similar in the 32nd response at 141 and the second corrected version of the 33rd /34[th] response at 101.

4.      Plaintiffs' responses regarding "Foster home subsidies" are similar in the 32nd response at 68-69 and the second corrected version of the 33rd/34[th] response at 59-60.

5.      Plaintiffs' responses regarding "Permanency and Preventive Services" are similar in certain areas in the 32nd response at 71-72 and the second corrected version of the 33rd/34[th] response at 75-77.

6.      The discussions about the decline in foster care in the 32nd response at 41 and the second corrected version of the 33rd/34[th] response at 52 are also similar.

7.      Plaintiffs' responses regarding "Placement Shortages" in the 31st response at 26, subsections (d)-(f) correspond with subsections (a)-(f) in the 32nd response at 45, and (a)-(f) in the 32nd response correspond with (a)-(I) in the second corrected version of the 33rd/34[th] response at 57-58.

-24-

Plaintiffs' attorneys spent too much time preparing responses.    (Exhibit 6, Peart Decl. at 3, ¶ 7.)  Their efforts in this regard have evolved into an unproductive monitoring activity. This Court should reduce the hours Plaintiffs' attorneys spent preparing the responses by 40 percent.  *See Williamsburg Fair Housing Comm. v. N.Y. City Housing Auth.*, 2007 WL 486610 *5 (S.D. N.Y. 2007) (district has discretion to use a percentage reduction to arrive at a reasonable fee) (citations omitted).

> **2.    The Hours Billed by Mirviss Should be Reduced Further to Represent an Equitable and Reasonable Award.**

In August 2005, Lipkin entered her appearance in the case to take over Mirviss' role as lead attorney.  (Lipkin Decl. at 3, ¶ 8; Wolf Decl. at 9, ¶ 17.)  Defendants did not oppose Lipkin's appearance in the case, because they understood that with Lipkin assuming the leadership responsibilities, Mirviss' billable hours would decrease.  This did not occur. Instead, Mirviss continued to bill substantially.  For example, during the period, September 1, 2005, through May 31, 2006, Mirviss claims to have worked 380.3 hours.[9]  (Exhibit 11, Chart of Mirviss' Hours on Activities September 1, 2005, through May 31, 2006.)

Moreover, some of Mirviss's activities arguably are not related to monitoring the Consent Decree and, therefore, are not compensable.  His activities during this time included:

1.    Purchasing a flashlight to tour the Gay Street facility (Mirviss billing entry at 6/11/06).

---

[9] This excludes the time Mirviss spent on responses to the six-month compliance reports and conferences with the court monitor.

2.      Working on a mandamus petition that was never filed (Mirviss billing entries at 12/14/05, 12/16/05, 12/17/05).

3.      Meeting with an anonymous source regarding new QA procedures (Mirviss billing entry at 6/10/05).

4.      Training Legal Aid attorneys on reasonable efforts (Mirviss billing entry at 10/10/05).

These activities are not compensable.  *See Hyatt v. Barnhardt*, 315 F.3d 239 (4th Cir. 2002)(training attorneys was not a compensable activity for an award of attorneys' fees).  During this period, Mirviss also performed a myriad of other out-of-court activities, such as: attending meetings with co-counsel and with children's CINA attorneys; writing letters; and analyzing and gathering information.  *See Walker,* 99 F.3d at 771 (out-of-court monitoring activities, such as "gathering information, investigating complaints, and 'developing a coherent picture'" may be considered clerical work that could have been handled by non-lawyers.")

This Court should not award Plaintiffs attorneys' fees for the full 380.3 hours of Mirviss' activities.  Mirviss' hours should be reduced by 40%.

### 3. The Hours Billed by Mirviss and Lipkin for Contacts with Parties Identified as "Advocates" Should Be Reduced.

Both Mirviss and Lipkin spent numerous hours consulting with unknown sources identified only as "advocates," conducting work that extends beyond the scope of monitoring the Consent Decree. The following chart shows examples of such activities.

| Date | Timekeeper | Description | Hours |
|------|-----------|-------------|-------|
| 12/1/04 | MYM | tel. call from advocate re: commission and solicitation for suggestions to new Exec. Dir. Of BCDSS | 0.2 |
| 12/2/04 | MYM | tel. call with advocates re: status of case and strategy for upcoming actions | 0.1 |
| 12/10/04 | MYM | tel. call from advocate re: recommendations to BCDSS (.1); tel. call with advocate re: kinship care issues (.2) | 0.3 |
| 12/17/04 | MYM | tel. call with advocate re: status and monitoring (.2); tel. call with advocate re: strategy for enforcement and other issues arising from draft 32nd Report (1) | 1.2 |
| 12/22/04 | MYM | e-mails to advocates re: scheduling of conference call on strategies | 0.1 |
| 1/18/05 | MYM | telephone call with advocate re: response (.2); send copies of report to advocates        (.1) | 0.3 |
| 1/21/05 | MYM | telephone call from advocate re: issue paper re: non-compliance and monitoring | 0.1 |
| 2/16/05 | MYM | e-mail to and from advocate re: status | 0.3 |
| 2/17/05 | MYM | conference call with advocates re: status of compliance and possible enforcement strategies | 1.5 |
| 2/23/05 | MYM | answer questions from advocates regarding sources for various statistical reports and issues on conditions for Baltimore City child welfare status | 0.5 |
| 2/24/05 | MYM | Discussion with advocate re: defendants' 33rd six-month compliance report and implications for monitoring and enforcement | 0.2 |
| 2/25/05 | MYM | E-mails to children's CINA counsel, advocates et al. Re: scheduling and preparation for meeting with CINA lawyers | 0.3 |
| 3/25/05 | MYM | Telephone calls from various advocates re: Michelle Lane and impact on consent decree | 0.3 |

| Date | Timekeeper | Description | Hours |
|------|-----------|-------------|-------|
| 3/29/05 | MYM | Telephone calls with advocate and staff of General Assembly members re: ALJ compliance and defendants' data inaccuracies | 0.4 |
| 3/31/05 | MYM | Telephone call with advocate re: new PIP | 0.2 |
| 4/7/05 | MYM | Telephone call with advocate re: status of case and recent events (.4); send advocate materials (.1, .1) | 0.6 |
| 4/9/05 | MYM | Telephone call with advocate re: Baltimore Sun series on group homes | 0.4 |
| 4/11/05 | MYM | Telephone call with child advocate re: Sun series on group home scandal (.1, .1, .2, .1); review newest article (.2) | 0.7 |
| 4/14/05 | MYM | Telephone call with advocate re: status (.2);telephone call to advocate re: PIP (.1) | 0.3 |
| 4/22/05 | MYM | Telephone call with advocate re: possible L.J. violation in CINA case | 0.2 |
| 4/28/05 | MYM | Telephone call with attorney re: report of severe abuse of CINA child while in foster care | 0.2 |
| 4/29/05 | MYM | meeting with advocate re: violation of the consent decree (.2); telephone call with advocate re: L.J. monitoring strategies (.3) | 0.5 |
| 5/3/05 | MYM | meeting with attorneys re: abuse of foster child care | 0.3 |
| 5/10/05 | MYM | Meeting with advocate re: case investigations | 0.8 |
| 6/10/05 | MYM | Telephone call to advocate re: questions and issues to examine at Gay Street (.4); Telephone call from advocate re: same (.2); discussion with advocate re: results of Gay Street inspection (.4); discussion with advocate re: same (.1); Telephone call with advocate re: relative caretaker case (.1); discussion with advocate re: Gay Street inspection (.2); presentation to CINA attorneys re: reasonable efforts issues (.5) | 2.2 |
| 6/13/05 | MYM | Telephone call to CPS hotline to make neglect report against BCDSS (.3); discussion with advocate re: status on Gay Street (.2, .1); telephone call with advocate re: Gay Street facility (.1); telephone call with advocate re: same (.1); telephone call with advocate (.2) | 1.0 |
| 6/14/05 | MYM | Telephone call with advocate re: Gay Street status (.3); telephone call with advocate re: Gay Street and court options (.2); telephone call with advocate re: Gay Street (.2); e-mail with advocate re: Gay Street (.1) | 0.8 |
| 6/15/05 | MYM | Telephone call with advocate re: foster mother | 0.3 |
| 6/16/05 | MYM | e-mail to advocate re: schedule for investigation (.1); telephone call with advocate re: Gay Street (.2); telephone call with advocate re: placement issues (.3); telephone call with advocate re: conversation with advocate and placement issues (.3) | 0.9 |
| 6/27/05 | MYM | Review e-mail from advocate re: child welfare reform list for Secretary McCabe | 0.2 |

-28-

| Date | Timekeeper | Description | Hours |
|------|-----------|-------------|-------|
| 7/1/05 | MYM | Telephone call with advocate re: new child welfare initiative of Governor and enforcement strategies (.3); telephone call from and to advocate re: status (.1); review case studies from volunteer attorney (.3); e-mail to advocates re: Governor's initiatives (.1) | 0.8 |
| 7/13/05 | MYM | telephone call with advocate re: status (.3); review Daily Record articles re: abuse in foster case allegations (.2); e-mail to and from advocate re: foster child case (.1) | 0.6 |
| 7/26/05 | MYM | Telephone call with advocate re: status | 0.2 |
| 8/9/05 | MYM | Telephone call with advocate re: W. Stevenson comments on status of various reform efforts for Baltimore City | 0.2 |
| 8/17/05 | MYM | Review correspondence from advocate re: meeting with S. Chambers re: foster care issues | 0.1 |
| 12/6/05 | MYM | Telephone call with advocate re: ALJ report | 0.2 |
| 12/21/05 | MYM | e-mails to and from advocate re: status | 0.2 |
| 1/5/06 | MYM | Tel. call with advocate re: distribution of plaintiffs response to 33rd and 34th reports (.1); review response from advocate and distribute to Gary and Rhonda (.1) | 0.2 |
| 2/8/06 | MYM | tel. call to advocate re: [budget issues] | 0.1 |
| 6/9/06 | MYM | tel. call with advocate re: consulting on health care matters (.3); e-mails to and from R. Lipkin re: information for advocate (.1); tel. call to advocate re: same (.1) | 0.5 |
| 6/13/06 | MYM | tel. call with advocate re: conference call and meeting on Friday | 0.2 |
| 6/27/06 | MYM | E-mails to and from advocates re: status of subsidized guardianships and possible loss of FY 2007 funding | 0.4 |
| 7/7/06 | MYM | review correspondence from advocate re: subsidized guardianships | 0.1 |
| 7/7/06 | MYM | review materials from advocate re: prevention efforts | 0.1 |
| 8/24/06 | MYM | tel. call with advocate re: meeting with DHR and GO representatives on placement issues | 0.3 |
| 9/1/06 | MYM | Review e-mails from R. Lipkin to advocates re: MA citizenship requirement and possible impact on foster children | 0.2 |
| 10/11/06 | MYM | tel. call with advocate re: monitor candidates (.2); e-mail to team re: conversation with advocate (.1) | 0.3 |
| 10/24/06 | MYM | review correspondence from advocates re: [roll-out of MD Chessie in BCDSS and lack of updated information] | 0.1 |

| Date | Timekeeper | Description | Hours |
|------|------------|-------------|-------|
| 10/27/06 | MYM | review response from advocate re: [candidate resume for consideration as possible monitor candidate] (.1); review further correspondence from and to advocate re: other programs and possible monitors from other state university (.1, .1) | 0.3 |
| 10/30/06 | WG | TC advocate, follow-up re monitor | 0.2 |
| 10/31/06 | WG | TC advocate re monitor candidates | 0.4 |
| 11/16/06 | MYM | tel. call to advocate re: transition issues | 0.1 |
| | | **TOTAL MYM** | 21.2 |
| | | | |
| 8/9/05 | RBL | Meeting with advocates re: educational issues, esp. school enrollment and new records transfer law | 0.8 |
| 10/6/05 | RBL | Mtg with advocate re status of BCDSS, work of Board, ombudsman issues | 1.8 |
| 10/12/05 | RBL | Mtg w advocate re education and foster care issues | 1.5 |
| 11/1/05 | RBL | Mtg with advocates re education issues | 1.0 |
| 11/1/05 | RBL | Mtg with advocate re health issues | 1.5 |
| 11/9/05 | RBL | Mtg with advocates re overlap issues and DSS commission work | 1.5 |
| 1/3/06 | RBL | Meeting advocates about education issues | 1.0 |
| 1/9/06 | RBL | Provide advice to advocate re education issue of class member | 1.3 |
| 1/11/06 | RBL | Review and discuss congregate care issues with other advocates | 3.0 |
| 1/23/06 | RBL | Draft e-mail after review of newspaper article to advocate re CYC | 0.3 |
| 2/8/06 | RBL | Meeting with child advocate re changes to foster care payment schedules | 0.3 |
| 2/28/06 | RBL | Draft e-mail and review research re SSI and foster youth with advocate | 0.4 |
| 3/6/06 | RBL | Meeting with advocates re SSI and foster youth | 2.0 |
| 3/3/06 | RBL | Draft e-mail to advocates re CYC | 0.3 |
| 3/8/06 | RBL | Draft e-mail re expert with advocate | 0.2 |
| 3/8/06 | RBL | Meeting advocates re education issues | 1.0 |
| 3/13/06 | RBL | Draft e-mail to advocates re mtg | 0.2 |
| 3/23/06 | RBL | Draft materials for advocate | 0.3 |

| Date | Timekeeper | Description | Hours |
|---|---|---|---|
| 3/23/06 | RBL | Meeting advocates re health care and other issues | 1.5 |
| 4/6/06 | RBL | Tele call advocate re foster child | 0.1 |
| 4/17/06 | RBL | Draft e-mail to advocate re statistics for response to 35th report | 0.3 |
| 4/19/06 | RBL | Meeting advocate re abuse and neglect reports and dispositions | 0.8 |
| 4/21/06 | RBL | Draft e-mail advocates re mtg | 0.1 |
| 4/25/06 | RBL | Tele call advocate - re H.G. | 0.3 |
| 4/25/06 | RBL | Tele call advocate re adoptions | 0.3 |
| 4/25/06 | RBL | Tele call and follow up e-mails with advocate re workforce issues in Baltimore | 1.3 |
| 5/1/06 | RBL | Meeting with advocates re health issues | 2.8 |
| 5/2/06 | RBL | Draft e-mail advocates re foster youth health, murders, gay youth | 0.5 |
| 5/2/06 | RBL | Tele call advocate re needs of foster children | 0.5 |
| 5/3/06 | RBL | Draft e-mail advocate re health issues | 0.2 |
| 5/3/06 | RBL | Review health materials from advocates | 0.2 |
| 5/5/06 | RBL | Draft e-mail with advocate re status of child at Gay St. | 0.4 |
| 5/8/06 | RBL | Draft e-mail advocate re health issues | 0.2 |
| 5/15/06 | RBL | Meeting advocate re foster youth | 0.5 |
| 5/17/06 | RBL | Draft e-mail advocate re scheduling | 0.2 |
| 5/25/06 | RBL | Meeting advocate re foster parent issues | 0.2 |
| 5/31/06 | RBL | Draft e-mail advocate re health care | 0.5 |
| 7/25/06 | RBL | Meeting advocates/consultants re proposals | 2.5 |
| 8/7/06 | RBL | Tele call advocate re Gay St. | 0.3 |
| 8/8/06 | RBL | Meeting re wraparound and mental health services with advocates | 2.3 |
| 8/11/06 | RBL | Meeting advocates re ALJ issues (incl. .5 prep) | 2.5 |
| 8/15/06 | RBL | Meeting advocates re CHESSIE | 2.0 |
| 8/18/06 | RBL | Meeting advocate re status of case, file reviews | 1.5 |
| 8/24/06 | RBL | Draft e-mail with advocate re health resources | 0.2 |
| 8/24/06 | RBL | Tele call advocate re motel usage | 0.3 |

| Date | Timekeeper | Description | Hours |
|---|---|---|---|
| 8/24/06 | RBL | Tele call advocate re substance abuse resources and funding for treatment | 0.8 |
| 8/25/06 | RBL | Tele call advocate re citizenship documentation for foster children | 0.3 |
| 8/25/06 | RBL | Tele call advocate re education issues for negotiations | 0.5 |
| 8/29/06 | RBL | Tele call advocates re CHESSIE | 0.2 |
| 8/29/06 | RBL | Tele call advocate re education and PIP issues | 1.0 |
| 8/31/06 | RBL | Tele call advocate re cit documentation issues | 0.3 |
| 9/1/06 | RBL | Meeting advocates re kinship care | 0.8 |
| 9/12/06 | RBL | Tele call advocates re Chessie problems | 0.5 |
| 9/15/06 | RBL | Meeting advocate re education issues | 0.5 |
| 9/26/06 | RBL | Tele call advocate re Chessie and other issues | 0.3 |
| 9/26/06 | RBL | Tele call advocates. Re Chessie and other issues | 0.5 |
| 10/6/06 | RBL | Meeting advocates re pending issues | 2.0 |
| 10/10/06 | RBL | Tele call advocate re Chessie issues | 0.1 |
| 10/11/06 | RBL | Meeting with advocate re placement and adoption issues | 1.5 |
| 10/12/06 | RBL | Tele call advocate re visitation problems | 0.5 |
| 10/13/06 | RBL | Meeting advocate re foster child placement issue | 0.5 |
| 10/25/06 | RBL | Tele call with advocate and review of Chessie materials | 0.3 |
| 11/17/06 | RBL | Draft e-mail advocates re CHESSIE | 0.2 |
| 11/28/06 | RBL | Draft e-mail advocate re mtg | 0.1 |
| 11/28/06 | RBL | Draft e-mail advocate with further references for SSI issues | 0.2 |
| 11/28/06 | RBL | Draft e-mail advocates for updates on cases of foster youth | 0.2 |
| 11/28/06 | RBL | Meeting advocates re SSI benefit issues | 2.5 |
| | | **TOTAL RBL** | 54.7 |
| | | | |
| | | **COMBINED TOTAL** | 75.9 |

The specific nature of the 75.9 hours of activities and the identities of the "advocates" involved is unclear.  Therefore, this Court should reduce their hours by 40 percent.

### 4.     Lipkin's Hours Should be Reduced Due to Vague Billing Descriptions.

Many of Lipkin's billing descriptions are vague.  The vagueness in her descriptions is of such a nature so as to call into question the reasonableness of the number of hours she spent on these activities.  This vagueness typically presents itself when Lipkin bills for what she simply describes as "analyzing" or "reviewing" various "data," "reports," or "files."  The following is a list of  Lipkin's billings of one hour or more containing this vagueness:

| 8/19/05 | Analyze information ab | | $800 |
| 8/20/05 | Analyze data on Gay Street "shelter;" prepare for distribution to attorneys for children | 1.8 | $720 |
| 8/21/05 | Analyze data on Gay Street "shelter;" prepare for distribution to attorneys for children | 1.8 | $720 |
| 9/16/05 | Investigation Gay Street - review data, draft spreadsheets | 6.0 | $2,400 |
| 11/7/05 | Analyze data on children staying at Gay Street | 1.3 | $520 |
| 11/17/05 | Analyze and record data from DSS files of children staying overnight at Gay Street office | 3.3 | $1,320 |
| 1/5/06 | Review Gay Street Data | 3.3 | $1,320 |
| 1/6/06 | Analyze Gay Street Daily Reports | 5.0 | $2,000 |
| 2/6/06 | Analyze and plan next steps | 2.3 | $920 |
| 2/23/06 | Review and analyze Gay Street data | 2.4 | $960 |
| 3/21/06 | Draft table for children's files review | 1.5 | $600 |
| 7/31/06 | Review information from consultants | 1.6 | $640 |

Due to the inadequacy of their description, these billings should be eliminated from the Court's fee award.  *See Hensley v. Eckerhart*, 461 U.S. at 433 ("[w]here the

documentation of hours is inadequate, the district court may reduce the award accordingly"); *CoStar Group, Inc. v. LoopNet, Inc.*, 106 F.Supp.2d 780, 788 (D. Md. 2000)("court may reduce the number of hours awarded if the documentation is vague or incomplete").  The vagueness of simply describing the work as "analyzing" or "reviewing" unspecified "data," "reports," or "files" leaves the defendants and the Court only to speculate as to what work was done.  These vague billing entries are not made any clearer by their context or by the entries preceding or following them.  *See Pascuiti v. New York Yankees*, 108 F.Supp.2d 258, 270 (S.D. N.Y. 2000)("in many instances the context of vague entries is made clearer by the entries following it").  Neither Lipkin's nor her co-counsel's billings of the same time period comport with Lipkin's vague billing entries so as to explain the exact nature of what work she performed.  Furthermore, given the large number of hours she devoted to these vague tasks, this Court should require a greater "level of specificity . . .  proportional to the amount of time charged." *People ex rel. Vacco v. Rac Holding, Inc.*, 135 F.Supp.2d 359, 364-65 (N.D. N.Y. 2001)(citing *Pascuiti*, 108 F.Supp.2d at 270).

Examination of Lipkin's billings raises additional concerns.  For example, Lipkin bills substantial hours for what she characterizes as "review children's files."  This type of work noticeably tapers off in Lipkin's billings in May-June 2006.

| 3/21/06 | | Review children's files | 3.0 | $1200 |
|---------|--|-------------------------|-----|-------|
| 3/30/06 | | Review children's files | 1.3 | $520 |
| 3/31/06 | | Review children's files | 3.7 | $1480 |
| 4/3/06 | | Review children's files | 5.0 | $2000 |

-34-

| 6/9/06 | | Review Gay St. files | 2.3 | $920 |
|---|---|---|---|---|
| 6/12/06 | | Review Gay St. files | 3.3 | $1,320 |
| 6/13/06 | | Review children's files (Two entries consolidated) | 7.3 | $2920 |
| 7/27/06 | | Review Gay St. records | 3.3 | $1320 |
| 7/28/06 | | Review Gay St. records | 2.5 | $1000 |
| 7/31/06 | | Review individual children's files | 2.0 | $800 |
| 9/20/06 | | Review Gay Street files and reviews | 2.0 | $800 |
| 11/9/06 | | Review file of Gay St. Youth | 4.0 | $1600 |
| 11/13/06 | | Review file of Gay St. Youth | 5.5 | $2200 |
| 11/15/06 | | Review file of Gay St. Youth | 2.8 | $1120 |
| 11/16/06 | | Review file of Gay St. Youth (two consolidated entries) | 3.5 | $1400 |
| 11/17/06 | | Review file of Gay St. Youth | 5.0 | $2000 |
| 11/28/06 | | Review file of Gay St. Youth | 4.3 | $1720 |
| 11/29/06 | | Review file of Gay St. Youth | 5.3 | $2120 |
| 11/30/06 | | Review file of Gay St. Youth | 1.5 | $600 |

As Lipkin's work in this regard tapers, law students begin to bill a substantial amount of hours for work of the same description. *See, e.g.*:

| 06/09/06 | CT | Review individuals children's files | 5.50 | $522.50 |
|---|---|---|---|---|
| 06/12/06 | CT | Review individual children's files | 5.80 | $551.00 |
| 06/13/06 | CT | Review individual children's files | 6.00 | $570.00 |
| 06/16/06 | CT | Review individual children's files | 3.50 | $332.50 |
| 06/26/06 | JM | Review individual children's files | 3.50 | $332.50 |
| 07/17/06 | JM | Review individual children's files | 3.70 | $351.50 |
| 07/28/06 | DD | Review individual children's files | 4.10 | $389.50 |

The logical inference is that more junior staff assumed this duty and that the work was of a non-legal nature not requiring the expertise of counsel such as Lipkin. From these

observations it can be deduced that Lipkin's 66 plus total hours for "reviewing children's files" and the like was work capable of being performed by non-attorneys. Therefore, the Court should award fees at a substantially reduced paralegal rate, if it elects not to eliminate these hours altogether for vagueness.

>    **5.    Plaintiffs' Attorneys' Hours for Preparing their Fee Petitions and Negotiating Fees Are Excessive and Must be Reduced to Reach a Reasonable Fee.**

Mirviss's work on the first fee application took place between early December 2004 through late February 2005. During this time period, Mirviss spent approximately 80 hours drafting and revising his fee petition, 17 hours on the declarations in support of the petition, mostly his own, and 55 hours on reviewing, editing, and reconciling billing entries. On the reply to the Defendants' opposition, in mid-April 2005, he spent an additional 13.7 hours. (See entries dated April 11, 12, 13, 15, 16, 17, 18 of 2005, coded "FEE APP" or "FEE NEG"). All tolled, Mirviss spent over 165 hours on the first fee application.

The preparation work for the second fee petition performed during the billing period is equally excessive, though most work was performed by Lipkin. At various times between March and October of last year, Lipkin and Mirviss together spent nine hours preparing the petition and over 50 hours on reviewing, editing, and reconciling billing entries for what appears to be preparation for the instant petition. Lipkin billed the lion's share of these hours.

"In the absence of unusual circumstances, the hours allowed for preparing and litigating the attorney fee case should not exceed 3% of the hours in the main case when the

issue is submitted on the papers without a trial." *Coulter v. State of Tennessee*, 805 F.2d 146, 151 (6th Cir.1986).  According to the Petition, counsel recorded 3,686.4 hours during the billing period in question.  *See* Petition at 9.  The Petition also provides that Mirviss, Lipkin, and Posner collectively recorded 278.1 hours on preparing the fee petitions in this matter.  The number of hours devoted to preparing fee petitions amounts to over eight percent of the total hours billed in the main case (3,408.3 hours).  This percentage will increase in the event the Court finds that some hours billed by plaintiffs' counsel cannot be justifiably awarded.  Thus, at the suggestion of the Sixth Circuit in *Coulter*, this Court should at a minimum cut the number of hours plaintiffs' counsel  spent preparing the fee petition in half so as to bring the number of hours devoted to this task under three  percent of the hours devoted to the main case.

Further support for a substantial reduction in the fees claimed by plaintiffs' counsel for preparation of the fee petition can be found in a close examination of their billings.  For example, this Court should closely scrutinize Mirviss and Lipkin's hours spent reviewing, editing, and reconciling billing entries.  As observed previously, for the first fee application Mirviss billed over 55 hours for such work.  For the second fee application, Lipkin billed over 42 hours, while Mirviss billed for 7.9 hours, for a total of just under 50 hours.  The substantial billing entries for this work, one hour or more, were as follows:

| 01/11/05 | MYM | Begin work on analyzing time entries for reductions and redactions | 1.50 | $600.00 |
| 01/29/05 | MYM | Work on fee statement and reconciliation for fee petition | 2.10 | $840.00 |
| 01/30/05 | MYM | Work on fee petition fee statement and time reconciliation and edits | 5.70 | $2,280.00 |

| 01/31/05 | MYM | Continue work on revisions to fee statements and reconciliation and edits to fee time | 6.50 | $2,600.00 |
|---|---|---|---|---|
| 02/01/05 | MYM | Finish initial fee reconciliation (4.5); begin revisions (2.3) | 6.80 | $2,720.00 |
| 02/03/05 | MYM | Finish new draft of memorandum (3.5); work on fee petition time reconciliation (4.0) | 7.50 | $3,000.00 |
| 02/04/05 | MYM | Finish review and reconciliation of all time entries and review of reductions and other issues | 7.50 | $3,000.00 |
| 2/09/05 | MYM | Proof, edit and continue reduction of time entries and general reconciliation | 5.20 | $2,080.00 |
| 02/10/05 | MYM | Finish work on reconciliation and reduction of fee entries, proof reading, and conforming reductions | 3.80 | $1,520.00 |
| 02/11/05 | MYM | Proof and edit changes to time entry tables | 2.80 | $1,120.00 |
| 02/12/05 | MYM | Review and proofread time charts | 1.80 | $720.00 |
| 02/13/05 | MYM | Begin redactions of time entries (2.2) and finish input of text and reconciliation with declarations (1.0) | 3.20 | $1,280.00 |
| 02/16/05 | MYM | Proof and edit final revisions and finalize time entries (1.5); | 1.50 | $600.00 |
| 02/18/05 | MYM | Work on creating workable disbursement charts and on collecting and incorporating correct fee information into the memo, the petition and the order (3.1); | 3.1 | $1,240.00 |
| 02/19/05 | MYM | Final revisions to memo, petition and Mirviss declaration including final fee calculations and expense reports, including proofreading and double checks on all data reported in the memo and declaration and final entry and double check of all declaration citations | 5.80 | $2,320.00 |
| 03/07/06 | MYM | Finish initial round of review, coding and breaking of entries into codes, and proofing/editing of entries | 3.20 | $1,280.00 |
| 03/08/06 | MYM | Review and edit fee corrections to G. Posner and MYM fee time | 1.30 | $520.00 |
| 03/10/06 | MYM | Continue work on review of time entries for fee petition | 1.20 | $480.00 |
| 03/20/06 | RBL | Analyze timekeeping (consolidated 4 entries) | 5.80 | $2,320.00 |
| 03/23/06 | RBL | Draft memo and time reconciliation fee motion | 1.40 | $560.00 |
| 03/27/06 | RBL | Analyze and reconcile attorney fee data | 3.30 | $1,320.00 |
| 03/28/06 | RBL | Analyze and reconcile attorney fees data | 5.80 | $2,320.00 |
| 03/29/06 | RBL | Analyze and reconcile attorney fees data | 3.00 | $1,200.00 |
| 03/30/06 | RBL | Analyze and reconcile attorney fees data | 1.50 | $600.00 |
| 03/30/06 | RBL | Review and revise memo and declaration | 2.00 | $800.00 |
| 04/06/06 | RBL | Analyze and redact hours for fee petition | 1.30 | $520.00 |
| 10/06/06 | RBL | Analyze fee information from co-counsel | 2.00 | $800.00 |

| 10/09/06 | RBL | Analyze fee data in preparation for fee petition | 1.30 | $520.00 |
|----------|-----|--------------------------------------------------|------|---------|
| 10/10/06 | RBL | Analyze fee data for fee proposal | 3.80 | $1,520.00 |
| 10/11/06 | RBL | Analyze time records for fee request | 4.50 | $1,800.00 |
| 10/12/06 | RBL | Analyze fees for fee petition | 3.10 | $1,240.00 |
| 10/13/06 | RBL | Analyze fee data for fee data request | 3.50 | $1,400.00 |

"In the private market place, lawyers do not usually charge, and clients do not usually pay, for the time it takes lawyers to calculate their fees." *Coulter*, 805 F.2d at 151. Billing for a purely ministerial service which could have been performed by support staff members, which calculating fees inarguably constitutes, is a "legitimate ground for decreasing a lodestar." *Bell v. United Princeton Properties, Inc.*, 884 F.2d 713, 722 (3rd Cir. 1989).

Here, counsel's billings for what is essentially "calculating their fees" should be eliminated altogether from their fee award in accordance with the observation made in *Coulter*. This result is buttressed by the excessive number of hours counsel devoted to this task - over 100 in all. At $400 an hour, plaintiffs' counsel audaciously requests the Court to award them over $40,000 for the task of calculating their fees. In light of this, the Court should not award Plaintiffs any fees for these hours billed.

Plaintiffs' counsel fail to cite any case law in support of the contention that such fees are recoverable. To the contrary, Fourth Circuit precedent clearly indicates that counsel cannot recover such fees. *See, e.g., In re Conklin*, 946 F.2d 306, 316 (4th Cir.1991)(reducing fee award due to "incomplete, inaccurate and irregular records"). Therefore, the Court should

not weigh the hours claimed to be deducted at Plaintiffs' counsel's own initiative where those hours could not have lawfully been awarded to them in the first instance.

>**6.    The Hours the Paralegals Spent Performing Clerical Work Should Be Reduced.**

This Court should award the Local Guidelines hourly rates for paralegals Artigiani and Capistrano and reduce their hours by fifty percent.  The two paralegals spent 284.4 hours on "purely clerical tasks" that "are ordinarily a part of a law office's overhead and should not be compensated." *Wilson v. Barnhard*, 2006 WL 3455071 *1 (W.D. Va. 2006).  They spent their time performing activities to create a web-based database for the Plaintiffs.  (*See* Mirviss Decl. at 6, ¶ 14.)

"To award paralegal fees, a court must determine 'the work was sufficiently complex to justify the efforts of a paralegal, as opposed to an employee at the next rung lower on the pay-scale ladder.'"  *Delgado v. Village of Rosemont*, 2006 WL 3147695 *2 (N.D.. Ill. 2006)(citations omitted).  Activities such as "factual investigation, conducting legal research, summarizing depositions, checking citations, compiling statistical and financial data, preparing court documents, serving process, and discussing the case with attorneys are sufficiently complex[,]" and should be  allowed.  *Id.* at *2.  Conversely, clerical and secretarial tasks, such as "preparing documents], copying documents, assembling files . . . docketing or 'logging' case events into an internal case tracking system," should be disallowed.  *Id.*  at *2.  Moreover, tasks that are billed as "'review scan and code documents and billed summation database,' 'work on database,' are [also] clerical duties." *Id.* (citation

omitted)  Here, the two paralegals' activities included:  copying and scanning documents, coding pleadings, document work, database management, and making telephone calls and e-mailing.  They should not receive full compensation for these activities.

Furthermore, the $31,953.86 expense for external copying should be reduced by fifty percent, because creating a web-based database is not a monitoring activity that should be compensated and any related costs should be disallowed.  *See Delgado*, 2006 WL 3147695 *3 (fees may be awarded for entering notes into an *existing* database)(emphasis added).

### C.    Any Award for Expenses Should Be Reduced.

Plaintiffs' counsel's request for expenses are excessive and unreasonable in that their request contains no specific description for items such as telecopier, teleconference, meals (not part of overnight travel), courier services, overtime, internal copying, and document scanning.  *See* Plaintiffs' Counsel's Petition, pp. 10-11.  Plaintiffs' counsel have provided no invoices detailing with whom teleconferences were placed, with whom meals were eaten as part of the monitoring or negotiating process, to whom items were cornered (and why it was necessary as opposed to regular mailing), to whom overtime wages were paid, or what documents were necessary to photocopy and/or scan in enforcement of the Consent Decree. Further, charges for "Document Scanning" are duplicative given the fact Plaintiffs' counsel have already billed extensively for document scanning throughout their time records.  This Court has held that vague or incomplete documentation of expenses do not warrant payment of expenses to the extent Plaintiffs seek.  For instance, in *Thompson v. U.S. Dep't. of Hous.*

-41-

*& Urban Dev.*, the court found, "[Plaintifff's] itemization is a chronological listing of expenses, not segregated by litigation phase or task, by type of charges, and devoid of any explanation of the nature and purpose of the charge. This lack of detail makes review for reasonableness very difficulty [sic] and warrants a twenty-five percent reduction across the board to compensate." 2001 WL 1636517 (D. Md. 2001). Similarly, Plaintiffs' counsel here simply provide a general description of the expense and an amount charged without any explanation of the nature or purpose of the expense. Without more information, it is unreasonable to expect Defendants to compensate them the full amount sought. Thus, Defendants should receive a twenty-five percent reduction across the board for the above expenses.

## V.  SUMMARY OF REASONABLE ADJUSTMENTS

For the reasons set forth in this Opposition, the Defendants request that any fees to be awarded be reduced. The tables attached as Exhibits 12 and 13 set forth Defendants' recommendations that are supported by case law and the Local Guidelines. In addition, in light of the nature of this case and the limited resources available to the State, Defendants have recommended an across-the-board reduction of twenty percent.

In Mirviss' declaration he asserts that his foremost priority is funding Lipkin and any other monetary or enforcement needs of the Plaintiffs. The Defendants' recommendation, including the twenty percent across-the-board reduction, provides sufficient resources for those purposes and a reasonable award of fees and expenses to the attorneys.

## VI.  CONCLUSION

For the reasons set forth above, the Defendants request that the Court reduce the award for attorneys' fees if the Court is inclined to award fees as set forth in the Summary of Necessary Adjustments.

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

_____/s/_____
DAVID E. BELLER
Assistant Attorney General
Saratoga State Center, Suite 1015
311 West Saratoga Street
Baltimore, Maryland  21201
(410) 767-7726
Federal Bar #00500
Fax: (410) 333-0026
Email: dbeller@oag.state.md.us
        dbeller@dhr.state.md.us

_____/s/_____
MILLICENT EDWARDS GORDON
Assistant Attorney General
Bank of America Building, Tower One
100 South Charles Street, 15th Floor
Baltimore, Maryland  21201
(443) 378-4180
Federal Bar #03204
Fax: (443) 378-4205
Email: mgordon@oag.state.md.us
        mgordon2@dhr.state.md.us

-43-

_____ /s/ _____
CAROL ANN SMITH
Assistant Attorney General
Saratoga State Center, Suite 1015
311 West Saratoga Street
Baltimore, Maryland  21201
(410) 767-7726
Federal Bar #6465
Fax: (410) 333-0026
Email: casmith@oag.state.md.us
         casmith@dhr.state.md.us

ATTORNEYS FOR DEFENDANTS